## GOULD MINES CO. v. BAUR.

(Circuit Court of Appeals, Seventh Circuit. January 2, 1918. Rehearing
Denied February 8, 1918.)

### No. 2436.

CORPORATIONS ☞30(4)—SUIT AGAINST PROMOTER—SECRET COMMISSION—SUF-
FICIENCY OF EVIDENCE.

In a suit by a corporation organized to purchase and operate a mining
property in Montana against the administratrix of one of the organizers,
who was active in its promotion and afterward disposed of his stock, the
bill alleged that a large secret commission was paid by the sellers of
the property out of the purchase price paid by complainant to the agent,
who negotiated the sale; that decedent knew of the contract for the com-
mission and received a share thereof, but fraudulently concealed such
facts from his associates, to whom he represented that no commission
was to be paid from the purchase money. *Held*, that the evidence was
insufficient to sustain such allegations or to establish any liability on
the part of the estate.

Evans, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern
Division of the Northern District of Illinois.

Suit in equity by the Gould Mines Company against Bertha D. Baur,
administratrix with the will annexed of Jacob Baur, deceased. De-
cree for defendant, and complainant appeals. Affirmed.

John S. Miller and William C. Rigby, both of Chicago, Ill., for ap-
pellant.

Horace Kent Tenney, of Chicago, Ill., for appellee.

Before BAKER, ALSCHULER, and EVANS, Circuit Judges.

ALSCHULER, Circuit Judge. The action was in chancery against
the estate of Jacob Baur, deceased, asking accounting for an amount
alleged to have been paid in fraud of plaintiff, as commission to one
Martin, the negotiator of a deal whereby a Montana mine was sold
to Baur and his associates, organizers of plaintiff corporation; it be-
ing charged that Baur fraudulently represented to his associates that
no commission was to be paid any one, whereas he not only knew the
contrary, but himself secretly received $25,000 of it. The evidence
was by deposition, and upon the hearing the bill was dismissed, on the
ground that the evidence did not sufficiently establish the fraud alleged.

The Standard Ore Company was a Montana corporation, its man-
aging officers being one Woolman and one Steece. It owned the Gould
mines, which it undertook to sell through Martin and his partner,
Canoll, of Montana, who were engaged in the selling, operating and
promoting of mines. It gave an option to Martin (or to another for
him) for the price of $350,000, and agreed with him in writing to pay
him a commission of $100,000, if sold at that price. Baur, of Chicago,
was a business man of large means, president of the Liquid Carbonic
Company. He was a half-brother of Martin's wife. The Mohr Broth-
ers, the Eddys, Scully, and Robbins, all evidently men of means, were

Baur's close friends, lunch companions, and some or all of them associates in business ventures other than the Gould mines; one of them being the Whitlatch mine, which, through the firm of Martin & Canoll, they had bought and were running.

In February, 1906, Martin presented to these men at Chicago the proposition to sell them the Gould mines. Several meetings were held. Martin showed a report of examination of the property by one Sizer, a mining engineer, and a secret partner of Martin & Canoll. Finally Baur and his associates proposed to pay $325,000 for the mine, $125,000 cash and the balance in installments. This was accepted, and the plaintiff was at once organized in Montana to take over and operate this property. Martin's option was revised to correspond with the new consideration, and a new agreement was entered into whereby his commission was to be $80,000, of which the sum of $46,667 was to be paid out of the first payment of $125,000 for the property. On March 5, 1906, the deal was consummated through the Union Bank & Trust Company of Helena, and out of the payment then made the sum of $46,667 appears on that date to have been deposited in that bank to the credit of Martin, and the evidence shows it to have been his commission on the first payment under his contract. Baur and his associates subscribed for the purchase of the mine as follows: Baur $25,000, the Mohr Brothers $60,000, the Eddys $20,000, Robbins $5,000, the Duntleys $10,000 and Scully $10,000—a total of $130,000. The capital stock of the new corporation, $1,000,000, was issued proportionately to these subscribers.

It seems that from the very start the venture did not prove successful. The outlay far exceeded the income. Money had to be raised to keep it running and to make further payments, and some of the stockholders, including the Mohrs and Baur, paid in considerable sums and obligated themselves for much more. Some disagreement among them developed, and within a year after the purchase Baur, after paying out about $20,000 further, surrendered his entire stock to the Mohrs. Others did the same, and the Mohrs soon acquired all, or practically all, the capital stock. Baur died July 19, 1912. The bill was filed September 2, 1913.

The defense is, in the main, that the evidence does not show that Baur was paid anything as commission or profit out of the deal, nor that he knew Martin was to have, or did have, any commission from it; that Martin's testimony is wholly unworthy of credit, that it is uncorroborated in its material aspects, and that without Martin there is absolutely no evidence to show that Baur received any money as a profit on the deal, or that he knew Martin was to have a commission; that Martin was an incompetent witness, because of his alleged stockholding in the plaintiff corporation, which plaintiff denies; that the action is barred by limitation, as well as by plaintiff's laches. The opinion would far transgress its proper scope, if it presented in detail the complicated facts appearing in the printed transcript of exceeding 1,000 pages, to the briefing and argument of which the counsel in the cause have deemed it wise to devote an aggregate of almost 500 pages. We will not undertake much more than to outline the essential facts, as

far as this may seem necessary to illustrate the conclusion reached from our study of the case.

Baur's representations to his associates respecting any commission on the deal are shown by witness C. M. Eddy, who testified that at some of the meetings where the proposition was considered it was inquired whether any one was to have a commission on the deal, and that Baur said there was no commission to any one, except that Martin would undertake to sell the treasury stock of the new company and was willing to accept as his entire compensation for his services, including the selling of the treasury stock, 10 per cent. of the total stock of the new company. Robbins testified that at the meetings Baur said the investors would all go in on the same basis. Louis and William Mohr testified to practically the same effect. It is urged for plaintiff that suspicion attaches to Baur's alleged frequent statements to his associates that there was no commission, as indicating that Baur was in advance trying to cover up something in that regard. It would seem from Eddy's testimony that such statements were not volunteered, but made as the result of inquiry. But neither Eddy nor the others pretend to exact recollection of the order of the conversation, nor the precise words employed in the conversations, which occurred almost nine years before they testified. It is not likely that what was then said, nor the order or manner of its saying, raised any suspicion in the minds of those business men who, before going into the deal, were all, Baur with the rest, evidently convinced that it promised success, else they would never have invested so largely; and Baur, even if he received a profit of $25,000, as claimed, would not have put in so much in addition. It is common knowledge that such transactions are based more largely on faith than on facts, and it is possible that in Baur's enthusiasm he may have pointed out that Martin's faith in the proposition was manifested by his willingness to look for his compensation entirely to the stock of the new company, whose value was, of course, dependent upon success. The record shows nothing from which it might be concluded that up to the time of the purchase there was a lack of faith in the property even in Martin, and so far as anything to the contrary appears, the fraud, if there was such, did not include an undertaking to put upon these investors a property known or believed to be worthless.

The direct evidence upon the vital factor of Baur's knowledge on the subject of Martin's commission, or of promise by Martin of a profit in the transaction, is confined wholly to the testimony of Martin; and his testimony thereon was as follows:

"In consummating this deal I told Jacob Baur that I would pay him $25,000 commission, or I would pay him $25,000 for his assistance in helping me sell the Gould mines."

He then asked leave to change his answer and said:

"I simply want to leave out the word 'commission'—that I would pay him $25,000 for his services."

Testifying nearly eight years after the event, without books or memorandum, and manifesting a peculiar want of memory as to other quite equally important details, it is most significant that he

recalled that the term "commission" was not employed. To the inquiring mind it does not seem important whether consideration for Baur's compensation should be denominated as a "commission," or "assistance," or in any other particular way. There is possible merit in the suggestion of plaintiff's counsel that Martin undertook to shield the estate from any liability beyond the $25,000, which he said Baur actually got. The positive testimony of Martin that he did not show Baur his commission contract, that he did not communicate to Baur the fact of his having a commission agreement, might lend support to such a theory. But this can avail plaintiff nothing, since it would only serve to bring general discredit upon Martin. His deliberate and purposeful suppression of important testimony in one respect would tend to discredit him generally. For aught to the contrary appearing in Martin's testimony of his conversation with Baur, if it were conceded that Martin did promise him $25,000, it might be that Baur expected it would be paid, not from any commission to Martin, but out of Martin's 10 per cent. of the capital stock of the new company which Martin was to get. True, there is nothing in the evidence to prove such a theory; but this or any other theory reasonably consistent with Baur's innocence of deliberate fraud on his associates in the purchase must be adopted rather than the theory of his guilt, where there is no positive evidence to support the latter. We find that, aside from what might be inferred from the promise of $25,000 to Baur as testified by Martin, the record fails to show that Baur had any knowledge whatever of any agreement Martin may have had for a commission on the sale of the mine, unless this is reasonably and necessarily deducible from the facts in regard to the payment of money to Baur, which will be later considered.

Is Martin to be regarded a credible witness, upon whose uncorroborated testimony the court would be warranted in predicating a decree finding fraud? The District Court found he was not a credible witness, and our study of the case convinces us of the correctness of this conclusion. It seems that in October, 1909, Canoll wrote one of the Mohrs asking certain information to be used in an action Canoll had brought in California against Martin, claiming that Martin had withheld from him certain partnership profits arising from the Gould mines deal, and suggesting in the letter that that deal had been so manipulated that he believed he could recover for Mohr and his friends from responsible parties all the money they had invested in it. Canoll was asked to see Mohr or his attorneys, and shortly thereafter he came to Chicago and met them. Thenceforth it seems that the control of the California suit passed from Canoll to the Mohrs' attorneys (plaintiff's counsel in the District Court suit), who thereupon undertook to use Canoll's claim as a leverage to obtain from Martin information which might serve to fix a liability upon Baur. Martin had been arrested on civil process in Canoll's action and had given bond, but it seems that action was not considered by Mohrs' counsel as broad enough in its scope, and its dismissal without prejudice was effected. The complaint in that action made no reference to Baur, and a new one was drawn under the direction of Mohrs' counsel wherein, among

other things, it was charged that Martin falsely pretended and claimed to have paid Baur, out of the commission Martin had received, $25,000 for his (Baur's) services in making the sale, and that Canoll was entitled to his proportion of that amount so retained by Martin, but pretended to have been paid Baur. The evident object was to compel Martin to answer the allegation, putting him in the position where, if he admitted paying the money, it might help to prove Mohrs' case against Baur, and, if he denied it, it might show partnership funds which he had taken for his own use, of which Canoll might have been entitled to a share. The new suit was conducted at the expense of plaintiff herein and by counsel which it employed. Canoll seemed for some reason or other to have subordinated his claim entirely to that of the Mohrs, who had acquired by that time practically all of the Gould mines stock. The purpose of maintaining the Canoll action was expressed in a letter from plaintiff's counsel in Chicago to a California lawyer, who arranged with Martin for giving his deposition in the then contemplated suit by plaintiff against Baur. "The suit brought in Los Angeles was purely for the purpose of obtaining information, and is controlled by us through Canoll, who is friendly." In the same letter it was stated that, since Baur had left all his property to the wife whom he had recently married, Martin "may be disposed to talk more freely now as to the transaction."

Over three years passed after Canoll entered into this arrangement to secure for the Mohrs a statement or deposition of Martin, before Martin's deposition in this case was given, which it seems to be conceded could not have been secured, unless Martin was willing to testify. It appears that, immediately after the deposition was given, Canoll's action was terminated, not by dismissal, as would ordinarily be the case where an action was abandoned, but as the result of a hearing at which both parties were represented by counsel, and Martin alone testified, resulting in a judgment in his favor protecting him against the future assertion of any such claim by Canoll. Just why Canoll was willing thus to abandon his claim and permit himself to be used as an instrument for securing the testimony of Martin as against Baur, the record fails to disclose. While the extraordinary means resorted to in order to obtain the testimony of the elusive Martin does not, of necessity, imply impropriety on the part of those who advised it, the circumstances tend in no slight degree to discredit the testimony thus obtained.

In Martin's answer under oath to Canoll's second suit he specifically denied Canoll's allegation that out of the profits of the deal Baur had been paid $25,000, or that he ever so stated to Canoll; but he stated in the answer that out of such profits, and with the full knowledge and consent of his partners that this be done, the Union Bank & Trust Company of Montana paid Baur for his assistance in promoting the sale $10,000. But when, on Martin's examination in the instant action, plaintiff's counsel directed his attention to the evident discrepancy between his sworn answer, stating the amount paid Baur was not $25,000, but $10,000, and his present testimony that the amount was $25,000, he did not make any attempt to reconcile or explain. The

consensus of all seems to be that Martin was not trustworthy. In the same letter of instructions to the California attorney, who was to arrange for Martin's deposition, it was stated:

"We understand Martin's word is not altogether reliable, and if a written and signed statement could be secured from him we believe it would be advisable."

In appellant's brief herein, Martin and associates are referred to as "all crooks together in a way"; and in our judgment the record justifies this very frank characterization, and we conclude that Martin's testimony is not to be relied on, except in so far as other and credible evidence in the case corroborates it.

This brings us to the very important circumstance that on February 26, 1906, there was paid to Baur by the Continental Bank of Chicago, on telegraphic order of the Union Bank of Montana, $16,000. This payment is positively shown by the letter from the Continental to the Union Bank, stating that the payment to Baur had been made on the telegraphic order of same date by the Union Bank, receipt of Baur to the Continental for $16,000, and Baur's bank book showing deposit of that sum on date of the receipt. The record discloses nothing to show why or on what account this payment was made, except the bare statement of Martin that $15,000 of it was in part payment of the $25,000 he had agreed to give Baur for his services in promoting the deal.

It is earnestly insisted for appellant that this payment, in and of itself, in connection with the evidence of how the amount was advanced and repaid to the Union Bank, affords conclusive corroboration of Martin's testimony in this respect, and must charge appellee with liability for at least the $15,000 so paid to Baur. To afford the necessary corroboration it is not enough that this circumstance merely be consistent with Martin's testimony, but it must not be explainable on any other reasonable hypothesis than the truth of Martin's explanation. Otherwise Martin, if knowing Baur received money for a different and an innocent purpose, might successfully weave about the fact of his having received it the story which he told, and straightway his story, if otherwise uncorroborated and unbelievable, would find confirmation in the very fact by him relied on to give color of verity to the fiction. Martin's testimony was not essential to show that Baur received this $16,000. This fact abundantly appeared wholly apart from Martin. But Martin's testimony is absolutely indispensable to show that it was received for the alleged fraudulent purpose.

It seems to be fairly within the range of reasonable possibility that Martin, who was quite extensively engaged in mining operations, in some of which his brother-in-law, Baur, had been a losing participant, was considerably indebted to Baur, who insisted on a substantial payment before going into another venture, and that Baur felt that, if this proposition was as good as Martin seemed to think, Martin's prospective 10 per cent. of the capital stock of the new company might enable him to raise money in the west, as it seems Martin had before been able to borrow considerable there, and perhaps Baur took this

course of insisting on payment, without any knowledge of Martin's agreement with the Standard Ore people for a commission from them.

The $16,000 coming as it did to Baur about six days before the deal was closed, a very pertinent inquiry is: To whom did the Union Bank extend the credit for it, seeing that its advance of February 26th was not repaid to it until March 5th? Although the record is replete with correspondence and documents concerning most phases of the case, as to this there appears none at all. And yet the matter must have been arranged by the bank with some one. If it was Baur, so far as the evidence shows, he was in Chicago, and it required letters or telegrams. Martin, of all persons, would know the facts, and yet he gave no testimony whatever as to any arrangement with the bank prior to the time the advance was made. The telegram to the Continental to pay Baur throws no light on what transpired before that telegram was sent. There was even no record prior to February 5th in the Montana bank of any such advance. The money was advanced, and it was only after the deal was closed, and a check given by Martin to repay the bank for the advance and the several days interest, that there was anything appearing in the records of that bank. It is scarcely presumable that such a transaction is an ordinary one, and we would suppose that even years afterwards, Bogart, the then cashier (and Martin's brother-in-law), or some other officer of the bank, would recall something about it. But there was no testimony of any one as to anything, beyond what the books show, which would throw any light on the character of this transaction and the relation of Baur to it, beyond his receipt of the money. As against all that the evidence thus fails to show, there is one item which the evidence does show, which in this connection must be regarded as very significant, in the absence of anything to explain it. It is the receipt, dated March 5, 1906, of the bank, by Bogart, cashier, to Martin, for $16,018.66, "in full payment of sum advanced him at Chicago February 26th by telegraph." This, the only evidence on the subject, shows the advance was made to Martin, and there is not a word of evidence to support the argumentative inference that the credit was extended by the Union Bank to Baur, who was to return to it the $16,000 in case the mining deal did not go through.

It appears Martin kept no books, and it was proved that Baur kept no accounts of his personal business, and there is nothing in the way of contemporaneous writings or accounts of either of them to throw any light on the subject. Witness Steece testified that Martin was quite a heavy borrower. He gave some instances, and stated his belief that he borrowed from Baur. Martin testified to borrowing $5,000 in Montana shortly before this deal was closed. Plaintiff's witness Sizer testified to his recollection of one loan of $5,000 from Baur to Martin. While Martin attempted no explanation why or how it happened that the $16,000 was advanced by the Union Bank several days before the deal was closed, it is interesting to note his testimony as to what the amount represented. He had just testified to the agreement whereby Baur was to have $25,000 as his compensation, and was asked whether this $16,000 was paid him in pursuance of that verbal agreement. His answer was, "$15,000 of it, *I think*." Being then asked

what the rest of it was for he said, "It was some money loaned me; *I imagine; I do not recollect exactly.*" If at that time, before the deal was closed, Martin's recollection, or the want of it, makes it possible that he was obtaining money in advance to pay Baur $1,000, he may have owed him, it is not unlikely that his memory was not better respecting the consideration for the rest of that payment to Baur. But it seemed quite necessary that he account for $1,000 in a manner other than payment of Baur's compensation, because he undertook to show that $10,000 more was paid to Baur immediately after the closing of the deal, and if the $16,000 were all applied on Baur's compensation, he would have been overpaid.

When the deal was closed, and the first payment deposited in the Union Bank, there was checked out to Martin as his commission the sum of $46,666.67, which he at once deposited in the Union Bank, and thereupon checked out various sums—$16,018.18 to the Union Bank, varying sums to Canoll, Sizer, and Steece for their several parts of the "split-up," and $10,000 to Woolman, which last-named check was indorsed by him and marked as having been paid on that date. When Martin was asked whether Baur had been paid the $10,000, he stated positively it was paid to him, and, when it was inquired when and how, he said:

"I do not recollect exactly, but I believe the $10,000 check which I gave to J. P. Woolman he turned it over to the Union Bank & Trust Company, and they transmitted it to him."

Bogart testified that upon the same date his bank drew a draft on the Continental Bank at Chicago payable to the order of the First National Bank of Chicago; that the draft was drawn at the request of, and charged to, the account in his bank, of a Spokane bank; but whether Woolman had anything to do with the draft he did not know, and he could not say whether or not Woolman took cash for his check, or that the check bore any relation whatever to the $10,000 draft referred to. What ultimately became of the proceeds of the Woolman check the record utterly fails to show. Woolman doubtless knew, but he died long before Baur, and none of his books or accounts, if he had any, appear in evidence. Suffice it, however, to say that the check or its proceeds were not directly or indirectly traced to Baur. His bank book, which showed deposit of the $16,000 some days before, showed nothing at all respecting the $10,000, or any similar sum, and it does not appear that had he received it he would have had reason for treating it differently than he did the other payment.

Contention is made that Baur agreed to take care of Scully's subscription of $10,000, and that the $10,000 Woolman check went to make up the first payment of $125,000; it appearing that the amount of the first draft sent out was only $115,000. But the Union Bank on March 5th credited the Standard Ore Company with an initial deposit of 125,-000. Whether that was in part made up by the Woolman check the evidence does not show. It would seem, however, that if the Woolman $10,000, was so accounted for, it could not also be accounted for as having come to Baur as the balance of his $25,000 compensation. But, if Baur did not get the $10,000 through the Woolman check, it is

not apparent how he afterwards got it from Martin, at least out of that deposit, since the evidence shows it was practically all checked out on that day, and went to sources from which Baur probably would not benefit.

It is urged that Baur might have got the $10,000 through Scully paying it to him; the theory being advanced that with the $10,000, which it is contended Baur thus received out of the Martin commission, the $125,000 payment was completed, and that, through Baur's agreement to advance Scully's $10,000, the Scully subscription being thus accounted for in the transaction, Baur would actually receive his $10,000 when Scully paid him, and thus the full $25,000 of compensation paid, as Martin says was his agreement with Baur. But under the evidence the trouble with such a theory is found in the fact that the cashbook of the Gould Mines Company, kept by the bookkeeper of the Mohrs, shows that Scully paid his subscription to the corporation itself, so that, if the cash book shows truly, then, if Scully also paid Baur, he paid twice, and this, of course, we must assume he did not do. Under date of February 26, 1906, in the cashbook appears the cash payment of the subscription as aforesaid of every one of the subscribers, except Scully. Nothing appears under his name until February 16, 1907, when a cash payment from him of $1,000 is shown, and on the following May 31st appear the items of receipt of "interest on Scully note $513.16," and "A. B. Scully a/c subscription $9,000." It is evident that, if the first payment on the mine was in part made up by the $10,000 as constituting payment of Scully's subscription, then Baur did not receive it as compensation, and, if thereafter Scully paid his subscription direct to the company, as the company's books show, then it nowhere appears that Baur ever got the $10,000, notwithstanding Martin's unqualified testimony that it was paid him. As in the case of Woolman and Baur, Scully also was dead before this action was brought, and there is nothing in evidence of his accounts or dealings to show what the facts really were. The evidence, even Martin's, utterly fails to show that he received the $10,000, and Martin's attempt to connect him with it serves only further to discredit his testimony with reference to the $15,000, and the subject generally of compensation to Baur.

While it is easily possible that Baur did receive the $15,000 in part payment of compensation to him for putting through this deal, it is also reasonably possible under the evidence that it was received by him for a different purpose, which did not involve him in the alleged breach of faith, and the alleged fraud upon his associates in the transaction. If he could have testified, his failure to do so under the circumstances would in itself have afforded probative inference unfavorable to his interest. But his death, far from throwing down the bars and permitting adverse inference, makes it necessary to establish his alleged fraud, not by presumptions and inferences, but by substantial proof. Essential links cannot be supplied by conjecture or probability. From careful perusal of this record and consideration of the elaborate briefs we are satisfied that there does not appear such credible and reliable evidence in support of the fraud charged, as to

warrant a decree in favor of appellant. In this state of the proof the much-mooted proposition of the claimed incompetency of Martin as a witness, because of alleged failure to show that his interest as a stockholder in plaintiff corporation had terminated, need not be considered.

. The delay of over seven years in the bringing of the action, during most of which time it seems the plaintiff had substantially as much ground as it had when the suit was actually begun, to believe that Baur had committed the alleged fraud, raises the question, discussed at large by counsel, whether the action is not barred by limitation and by laches. In the view we take it is not necessary to consider these questions; our conclusions being that upon the merits of the controversy, and apart from any such questions, the decree of the District Court must be, and it is, affirmed.

EVANS, Circuit Judge (dissenting). The final determination of this case must necessarily depend upon the weight given to the testimony of the witness Martin. With his story rejected the decree must be for the defendant; with it accepted the decree must be for the plaintiff. His statement, as well as the testimony of most of the other important witnesses, was taken by deposition. The learned trial judge did not have the opportunity to observe him while giving his testimony. This court, therefore, is in as good a position to weigh the testimony as was the trial court.

Conceding that plaintiff was required to prove its case clearly and satisfactorily, I am of the opinion that the burden has been met. Giving Baur the full benefit of the presumption of innocence, it seems to me that the evidence establishes the fact that he took part of the secret commission, the existence of which was denied by him to his fellow promoters. Instead of examining the record to ascertain discrepancies in minor particulars in a statement made by this witness some nine years after the transaction occurred, and when he was embarrassed by the presence of Mrs. Baur, his veracity should be determined by the usual and generally accepted methods of determining credibility.

So tested, I find no motive for his falsifying in favor of the plaintiff. The witness Martin was Baur's brother-in-law. For years he avoided plaintiff's subpoena or was beyond its reach. At the taking of the deposition he was attended by Baur's widow, who employed an attorney to represent him. She and her attorney had been with him in his home for several days prior to the taking of his deposition. Plaintiff's attorney was required to proceed with the examination as though witness was an adverse party. There was no friendliness—no collusion between Martin and plaintiff. There was friendliness on his part toward his relatives, and there was motive for Martin's coloring his testimony in favor of his sister-in-law. Yet, under these circumstances, Martin stated under oath that he gave Baur $25,000 of this secret commission. No witness disputes this statement. Why should it be rejected?

That a secret commission of $80,000 was paid for making the sale is conceded. That Baur represented to the other promoters that there

was no commission is clearly established by the testimony. That Martin paid $16,000 to Baur from the first payment on the commission is now admitted—established by Baur's bank book. With the admitted facts out of the way, there was nothing left for the plaintiff to prove, but that Baur knew he was receiving a part of the commission when this check was passed to his account. All the circumstances surrounding the payment of this money, the secrecy and caution which attended the transaction, the precautions taken to make certain that this payment should be made when the promoters paid their first installment of the purchase price, confirm Martin's testimony. The payment was made through the Union Bank & Trust Company of Helena, Mont., and the moneys received, as well as the moneys paid out, passed through the hands of Bogart, the cashier, another brother-in-law of Jacob Baur. Bogart's failure to testify concerning instructions by him received concerning payment of this $16,000 by Martin to Baur, as well as the failure of defendant's counsel to even inquire of him about this fact, which had been previously asserted by Martin, is most significant.

Certainly these circumstances help to overthrow the presumption of innocence which constitutes the sole defense in this case. Nor can the usual presumption of innocence be accorded Baur, for it is not disputed but that in reference to another phase of this same transaction his conduct is subject to severe criticism. When Martin's proposition was submitted to Baur's friends, in Baur's presence, a carefully prepared report on these mines by a mining engineer, Sizer, was also presented to induce favorable action. Sizer was the secret partner of Martin, who presented the engineer's report upon the mines as the statement of a disinterested and competent expert. Baur knew Sizer was not disinterested, but in fact was a secret partner of Martin, yet he remained silent when this false representation was made to his friends to induce them to invest in the enterprise. Can one guilty of such conduct hide behind a presumption which the law creates to shield the innocent? On what theory can Baur's silence under these circumstances be explained, other than that he was interested in the big commission that depended upon the consummation of the deal?

No other witness disputes Martin. The rational explanation of the check from Martin to Baur confirms Martin's story. Only speculations and possibilities refute it. I believe the court should have found from all the evidence that Baur participated in the commission, and his estate should be held accountable in this suit.